FILED

11/09/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0603

DA 20-0603

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 223

STATE OF MONTANA,

　　　　Plaintiff and Appellee,

　　v.

TRENTON MATTHEW LARSON,

　　　　Defendant and Appellant.

APPEAL FROM:　　District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DDC 20-89
Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellant:

　　　　Chad Wright, Appellate Defender, Alexander H. Pyle, Assistant
Appellate Defender, Helena, Montana

　　　　For Appellee:

　　　　Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

　　　　Leo J. Gallagher, Lewis and Clark County Attorney, Helena, Montana

　　　　Melissa Broch, Harris Law Office PLLC, Helena, Montana

　　　　　　　　　　Submitted on Briefs:　July 13, 2022
　　　　　　　　　　　　　　Decided:　November 9, 2022

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Trent Matthew Larson (Larson) was charged with possessing child pornography in violation of § 45-5-625(1)(e), MCA. He entered into a plea agreement in the First Judicial District Court, Lewis and Clark County, that reserved his right to appeal the denial of his suppression motion.

¶2 We affirm and restate the issue as follows:

*Did the District Court err when it failed to suppress evidence confiscated by a manager of a group home, pursuant to the group home's rules, who subsequently turned the evidence over to police?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 This case arises out of events occurring at an adult foster care group home in East Helena where Larson lived. Larson has Asperger's syndrome. His original placement in the group home was arranged through his parole and probation officer pursuant to a sentence for burglary. He lived at the group home for five years until he completed his probationary term and then continued to live in the group home for another two years until his electronic devices were confiscated and he was charged with the instant offense.

¶4 Connie Griffin Jacquez (Jacquez) was the owner and manager of the private group home when Larson lived there. She is neither a law enforcement officer nor a state employee. When Larson entered the group home, he was advised of the group home's rules. The rules were extensive and covered many aspects of a resident's life, such as maintenance of regular hygiene; no use of alcohol or drugs; and requirements that a resident follow their treatment plan, abide by a 10 p.m. curfew, complete assigned chores,

2

and participate in household recreational activities. The rules specifically prohibited certain activities as well. A resident could not possess pornographic material and the use of an electronic device for such a purpose would subject the device to confiscation. The rules relevant to these proceedings provided:

> 6. No pornographic material in the household, computers or movies allowed in the home . . .
> 23. Client may not use any computer owned by AFCP.[1] Usage of computers, gaming systems, is up to the discretion of the AFCP and may be confiscated/banned for violated of house/computer/internet rules at any time. This also pertains to gaming systems and electronics.
> 24. AFCP may/will set allotted amounts of time for computer usage. AFCP also may restrict any computer use in the home. Scheduled times for the use of the computer is up to the discretion of the house provider.

The rules also provided for a "30-day eviction notice" or, in the case where a resident continues to violate the rules after frequent warnings, "immediate eviction." Jacquez allowed, though not stated in the rules, a resident to have confiscated property back upon leaving the group home permanently. Larson signed the rules in 2013, thus affirming that he understood he was not allowed to view or possess pornography and that his electronics would be confiscated if he did not comply. Every year thereafter, Larson read and signed the rules indicating that he understood and agreed to them.

¶5 Unfortunately, Larson struggled to follow the rules of the group home. For instance, he projected adult pornography in a common residential area, which led to complaints from other residents. He was known to steal children's and women's undergarments.

---

[1] AFCP stands for "Adult Foster Care Provider."

Furthermore, he begun "propositioning" Jacquez's grandchildren and other children in the neighborhood. To prevent Larson from streaming pornography and engaging in inappropriate behavior, Jacquez used internet screening technology to block pornography from coming into the residence over the internet. Larson still found ways to avoid the blocking technology and continued to view pornography on his phone and computer. As a result, Jacquez confiscated his electronic devices.

¶6 At some point, Larson enrolled in school so Jacquez decided to give him another chance with computers. Jacquez allowed him to access his computer for the purpose of doing schoolwork only. However, Jacquez discovered that Larson was still using the computer to view pornography. Further attempts by Jacquez to monitor Larson's electronics failed and Larson subsequently admitted to Jacquez that "he was having thoughts of molesting children." Consequently, Jacquez confiscated Larson's computer and the rest of his electronic devices and directed him to seek treatment in a sexual offender treatment program. He agreed to attend treatment, and Jacquez accompanied him.

¶7 By now, Jacquez had confiscated numerous electronic devices from Larson—a computer, three or more phones, external hard drives, and video streaming devices. Notwithstanding, Larson continued to purchase new devices and tried to conceal them from Jacquez. Jacquez continued to confiscate them and place them in a safe to prevent Larson from accessing them.

¶8 Jacquez contacted the police on several occasions advising that she had confiscated pornography from a resident. On the first occasion, police said they would respond but

never did.  Two or three weeks later, a resident informed her that Larson had been hiding a phone in a plastic bag in the back of the toilet.  She confronted Larson about the phone and saw it contained child pornography when he handed it over to her.  Once Jacquez confiscated the phone, she called the police again, but the police did not answer.  Jacquez then asked Larson to leave the group home permanently.  Larson informed her that he was already planning to move out and had contacted law enforcement for a civil standby so he could get his electronics back.

¶9      When Larson contacted the police, Deputy Jordan Criske-Hall asked Larson why he "didn't just wait until the 30 days was up," in which case, Jacquez would return his electronics.  Larson replied that "he would probably be arrested" if he answered Deputy Criske-Hall's question.  The deputy continued to inquire, and Larson eventually disclosed that he had child pornography on his devices.  Deputy Criske-Hall responded to the group home and informed Jacquez about this conversation.  Jacquez told Deputy Criske-Hall that she had already confiscated some of Larson's electronics after she observed child pornography on his computer and phone.  Deputy Criske-Hall then asked Jacquez "to gather up all of the electronics that [she] could find of his."  Jacquez testified that she gave Deputy Criske-Hall Larson's electronics that she had already confiscated, along with two additional thumb drives she seized after Deputy Criske-Hall's request.  Jacquez testified at the suppression hearing that the only items she believed she had "not confiscated from him

5

was like the thumb—some thumb drives[.]"[2]  Deputy Criske-Hall did not have a warrant when Jacquez turned over Larson's electronics.

¶10    After Deputy Criske-Hall confiscated and secured the electronic devices, a detective from the Criminal Investigation Division applied for a search warrant.  The search warrant was granted on December 11, 2019.  The search of the devices revealed "80 or more" videos and pictures of child pornography involving infants, newborns, and preteen sex with adult men.  Moreover, a search of Larson's computer yielded anime[3] pictures of sex with toddlers and young females, along with search terms such as "Toddler girls open vagina." Larson admitted to detectives that he had used the "Dark Web" to search and look at child pornography, describing the websites he had visited.

¶11    The State charged Larson with possession of child pornography in violation of § 45-5-625(1)(e), MCA.  Larson moved to suppress any evidence derived from the electronic devices, arguing that Jacquez became a state actor when she turned over his electronic devices to police.  Larson also maintained that Jacquez, as a third-party, lacked authority to consent to the State seizing his devices without a warrant.  The District Court held a hearing and Jacquez testified, but Deputy Criske-Hall did not.  The District Court denied Larson's motion, finding that Jacquez "was not acting at the instigation of law

---

[2] Deputy Criske-Hall took possession of a camcorder, four cell phones, a tablet, a Kindle, a large external hard drive, a laptop computer, and two thumb drives.

[3] "Anime" is a style of "animation in Japan that is characterized by stark colorful graphics depicting vibrant characters in action-filled plots often with fantastic or futuristic themes." *Anime*, Merriam-Webster's Dictionary. (10th ed. 1993).

enforcement" and that "[s]he was acting to enforce the group home rules to which Larson had consented." The District Court concluded that Larson had "assumed the risk" that Jacquez would see the child pornography on his electronics, confiscate the devices, and turn the electronics over to law enforcement.

¶12 Larson entered into a plea agreement with the State, where the State agreed to recommend a ten-year sentence to the Montana State Prison with all time suspended. The District Court adopted the psychosexual evaluator's recommendation and designated Larson a Tier 2 sexual offender. Larson reserved his right to appeal the denial of his motion to suppress.

## STANDARD OF REVIEW

¶13 For the denial of a motion to suppress, this Court reviews findings of fact for clear error and conclusions of law for correctness. *State v. Pham*, 2021 MT 270, ¶ 11, 406 Mont. 109, 497 P.3d 217. Findings of fact are clearly erroneous if they are not supported by substantial evidence, the court misapprehends the effect of the evidence, or appellate review of the record convinces the court that a mistake has been made. *State v. Warclub*, 2005 MT 149, ¶ 23, 327 Mont. 352, 114 P.3d 254.

## DISCUSSION

¶14 *Did the District Court err when it failed to suppress evidence confiscated by a manager of a group home, pursuant to the group home's rules, who subsequently turned the evidence over to police?*

¶15 Larson argues that Jacquez became a state actor once Deputy Criske-Hall asked her to turn over Larson's electronic devices and that her actions resulted in a warrantless and

unlawful seizure.[4] Larson asserts that Jacquez did not gather up the electronics on her "own accord," but instead acted "as an arm of the police." He contends that Jacquez "performed the intrusive conduct to assist law enforcement" rather than for the purpose of implementing her group home rules. Larson also argues that under the third-party consent doctrine, Jacquez lacked authority to consent to a warrantless seizure by Deputy Criske-Hall of Larson's property. We turn first to Larson's contention that Jacquez was a state actor.

¶16 The Fourth Amendment to the United States Constitution and Article II, §§ 10 and 11 of the Montana Constitution protect citizens against unreasonable seizures. *Katz v. United States*, 389 U.S. 347, 353, 88 S. Ct. 507, 512 (1967); *State v. Staker*, 2021 MT 151, ¶ 9, 404 Mont. 307, 489 P.3d 489. A seizure occurs when there has been "some meaningful interference with an individual's possessory interests" or "dominion and control" over an individual's property. *United States v. Jacobsen*, 466 U.S. 109, 120-21, 104 S. Ct. 1652, 1660 (1984); *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 2305-06 (1990). The purpose of §§ 10 and 11 of the Montana Constitution is "to protect the privacy and security of individuals from unreasonable intrusion or interference." *State v. Hoover*, 2017 MT 236, ¶ 14, 388 Mont. 533, 402 P.3d 1224. These protections only take effect when an unlawful "search" or "seizure" has been established. *State v. Funkhouser*, 2020 MT 175, ¶ 16, 400 Mont. 373, 467 P.3d 574.

---

[4] Larson does not challenge the scope of the subsequent search or the reasonableness of the time law enforcement took to obtain a warrant after they took possession of the electronic devices.

¶17 The Fourth Amendment applies only to government action, and not that of a private party. *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S. Ct. 574, 576 (1921); *see also Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 614, 109 S. Ct. 1402, 1411 (1989) (holding that "the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his initiative. . ."). In *Jacobsen*, the United States Supreme Court explained that "a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official" does not violate the Fourth Amendment. 466 U.S. at 114-15 (quoting *Walter v. United States* 447 U.S. 649, 662, 100 S. Ct. 2395, 2404 (1980)). Thus, when an individual reveals private information to another, the person assumes the risk that the confidant may reveal the incriminating evidence to government authorities, and if that occurs, the Fourth Amendment does not protect the individual from governmental use of the evidence. *Jacobsen*, 466 U.S. at 115-18. In contrast, when a private party acts as an "instrument" or "agent" of the State in effecting a search or seizure, Fourth Amendment protections are implicated. *Coolidge v. New Hampshire*, 403 U.S. 443, 489, 91 S. Ct. 2022, 2049 (1971).

¶18 Correspondingly, this Court has held that Article II, §§ 10 and 11 of the Montana Constitution protect individuals from state action only. *State v. Wolfe*, 2020 MT 260, ¶ 6, 401 Mont. 511, 474 P.3d 318; *State v. Malkuch*, 2007 MT 60, ¶¶ 12-14, 336 Mont. 219, 154 P.3d 558; *State v. Long*, 216 Mont. 65, 67-71, 700 P.2d 153, 155-57 (1985). In *Wolfe*, we held that a private person did not act as a state actor when officers suggested the victim

of a rape answer her cell phone on speakerphone when her perpetrator called her. The victim was present with law enforcement and reporting the incident when Wolfe repeatedly texted and called her. *Wolfe*, ¶ 4. We explained that "[l]ike other constitutional guarantees of individual liberties, these provisions direct government action only." *Wolfe*, ¶ 10. The Fourth Amendment protections have as their origins and purpose an intent to restrain sovereign authority and are not intended to be a restraint upon other non-governmental actors. A private party acting "of her own accord," therefore, does not effectuate an unconstitutional and unreasonable search or seizure. *Long*, 216 Mont. at 71.

¶19     When analyzing whether a private person was acting as a state actor, this Court determines "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends." *Malkuch*, ¶ 14 (citing *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982); *United States v. Walther*, 652 F.2d 788, 791-91 (9th Cir. 1981)). In *Malkuch*, we held that a private party's search was not attributable to the State when the police officer told the private party he "needed evidence" to support her allegations of illegal drug activity and the private party subsequently searched the premises and seized the drugs. *Malkuch*, ¶ 16. When a private party has a "legitimate, independent motivation" to advance her own ends, "any dual motive to detect or prevent crime or assist police" does not make them a government agent. *United States v. Cleaveland*, 38 F.3d 1092, 1094 (9th Cir. 1994), as amended (Jan. 12, 1995).

¶20     Applying these principles here, we conclude Jacquez was not a state actor when she gave law enforcement Larson's electronic devices.  First, the record establishes the electronics had been confiscated before police became involved.  There was no pending criminal investigation; indeed, Jacquez made every effort to help Larson by allowing him to stay in the group home and get into treatment despite Larson having committed numerous violations.  Deputy Criske-Hall was not involved until after the numerous devices had already been confiscated and therefore could not have "acquiesced in [Jacquez's] intrusive conduct." *Malkuch*, ¶ 14.  Regarding the second *Malkuch* factor, Jacquez never expressed any intent to assist law enforcement in the investigation.  The record shows that she had two motives for collecting Larson's electronics: (1) to require Larson to comply with her group home rules, and (2) to dispose of the contraband contained in the devices.  Further, Jacquez disclaimed involvement or interest in the investigation when she stated that she "would have contacted the police again" and given the contraband to the police so law enforcement could have "done whatever with it."  She wanted Larson's contraband out of her possession, and she disposed of it by handing it over to Deputy Criske-Hall.  Jacquez had an interest in confiscating all Larson's electronics, including the thumb drives, to rid the premises of pornographic contraband.  Her interest in purging her home of pornography coupled with Deputy Criske-Hall's request for her to turn over all Larson's electronic devices did not make her a state actor.  *See Cleaveland*, 38 F.3d at 1094.

¶21 We turn now to Larson's argument that Jacquez did not have third-party authority to consent to the seizure of his electronic devices by law enforcement. Although we have already noted that the Supreme Court, in *Jacobsen*, established a person assumes the risk that a confidant may reveal incriminating evidence to government authorities, we begin with some basic principles surrounding third-party consent. "Warrantless seizures are per se unreasonable subject to only a few carefully drawn exceptions." *State v. Elison*, 2000 MT 288, ¶ 39, 302 Mont. 228, 14 P.3d 456. The State bears the burden of proving an exception to the warrant requirement. *State v. Goetz*, 2008 MT 296, ¶ 40, 345 Mont. 421, 191 P.3d 489. Consent represents one of the narrowly drawn exceptions to the warrant requirement. *State v. Schwarz*, 2006 MT 120, ¶ 14, 332 Mont. 243, 136 P.3d 989. For third-party consent to be valid against the defendant, "the consenting party must have actual authority" to consent to the government intrusion. *State v. McLees*, 2000 MT 6, ¶ 32, 298 Mont. 15, 994 P.2d 683. A third-party's authority to consent to a search or seizure must rest on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched." *McLees*, ¶ 13 (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974)). "The Montana Constitution requires that a court reviewing an issue of third-party consent determine—without deference to the officer at the scene—whether the third-party had common

12

authority." *State v. Urziceanu*, 2015 MT 58, ¶ 16, 378 Mont. 313, 344 P.3d 399 (citations omitted).

¶22 Larson argues that Jacquez did not have authority as a third-party to consent to law enforcement's seizure of his devices. Larson contends that because the deputy had an "objective indication" that Jacquez lacked common authority over the electronics, then Jacquez could not have consented to the seizure. He further argues that the State failed to satisfy its burden to establish that Jacquez had authority to consent because Deputy Criske-Hall was not aware of the group home rules. Therefore, Larson asserts that the group home rules cannot be used to establish that Jacquez, as a third-party, had authority to consent to the seizure.[5]

¶23 By agreeing to the group home rules, Larson relinquished his right to the exclusive possession of certain property which he used in violation of those rules. Larson, by signing the rules, gave the group home manager joint access and control for the purpose of seizing electronic devices when they contained pornographic material. Larson knew that Rules 6,

---

[5] Larson contends that, although a resident in Jacquez's group home, he still maintains his rights and autonomy. He cites Admin. R. Mont. 37.100.101(2), (3)(o), which provides that "[r]esidents' needs are to be addressed in a manner that supports and enables residents to maximize their ability to function at the highest level of independence possible" and residents "have the right to . . . be encouraged and assisted to exercise constitutional and legal rights . . ." *See also* § 50-5-1104(2)(i), (l), MCA (stating that residents retain rights "to privacy in [their] room[s]," "to reasonable safeguards for personal possessions" and to "have reasonable access to" their personal property). Larson has not developed this argument on appeal by placing the rule and statute within the context of the facts here. More particularly, however, the law relating to third-party consent, consent, and state actors, does not vanish in the face of this authority. Residents do not have the right, by virtue of the authority Larson cites, to possess pornography—a crime in itself—particularly when they have consented to confiscation of electronic devices containing pornographic material as a condition for residing in a group home.

23, and 24 prohibited him from possessing electronic devices containing pornography and he consented to the confiscation or a third-party obtaining control over any device that contained pornographic material. Therefore, Jacquez had the authority to control Larson's electronic devices as provided in the rules. By virtue of the house rules to which Larson agreed, Larson himself consented to the house manager confiscating his property. By giving the house manager authority to confiscate his electronic devices, Larson assumed the risk that she would discover the child pornography on these devices and turn this information over to the police. Here, Jacquez had the authority to turn over Larson's electronic devices to law enforcement.

¶24 Finally, Larson on appeal does not specifically distinguish the items taken by Jacquez before and after police involvement. Larson does suggest the seizure was unlawful because it "extend[ed] beyond" the items taken by Jacquez on her "own accord[.]" Presumably, Larson is referring to the seizure of the two thumb drives, which Jacquez confiscated after Deputy Criske-Hall asked her "to gather up all of [Larson's] electronics." However, Larson did not make this argument before the District Court—either in his motion to suppress, during the hearing, or in supplemental briefing the District Court ordered. It is well-established that to properly preserve an issue or argument for appeal, a party must raise it in the district court. *State v. Rosling*, 2008 MT 62, ¶ 76, 342 Mont. 1, 180 P.3d 1102. An issue or claim must be timely raised in the first instance in the trial court because "it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *State v. West*, 2008 MT 338,

14

¶ 16, 346 Mont. 244, 194 P.3d 683 (citations omitted).  Accordingly, we decline to consider whether Jacquez's seizure of the thumb drives was unlawful.

**CONCLUSION**

¶25     The District Court did not err when it denied Larson's Motion to Suppress.  Jacquez was acting as a private party when she confiscated, pursuant to rules of the group home, Larson's electronic devices containing pornography.  Further, by virtue of the rules to which Larson agreed, Larson consented to the group home manager confiscating his electronic devices.

¶26     Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE